1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10    SIMON F. RANTEESI,

11           Petitioner,                    2: 10 - cv - 439 - GEB TJB

12        vs.

13    RANDY GROUNDS,

14           Respondent.          ORDER, FINDINGS AND

15                                 RECOMMENDATIONS

16    _____/

17        Petitioner, Simon F. Ranteesi, is a state prisoner proceeding, *pro se*, with a petition for

18    writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving an

19    indeterminate sentence of twenty-six years to life in prison after a jury found him guilty on one

20    count of first degree murder and an associated weapon enhancement.  Petitioner raises seven

21    claims in this federal habeas petition; specifically: (1) the trial court's exclusion of the defense's

22    expert testimony regarding Petitioner's mental state violated his rights under the Sixth and

23    Fourteenth Amendments ("Claim I"); (2) the trial court erred in failing to give specific jury

24    instructions requested by Petitioner relating to unconsciousness and involuntary intoxication

25    ("Claim II"); (3) Petitioner's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), were

26    violated when his statements to police were admitted into evidence ("Claim III"); (4) the

1

prosecution withheld exculpatory evidence from Petitioner in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) ("Claim IV"); (5) Petitioner's trial counsel provided ineffective assistance in failing to investigate various issues ("Claim V"); (6) Petitioner's appellate counsel provided ineffective assistance in failing to raise certain claims on appeal ("Claim VI"); and, (7) the cumulative effect of the above errors rendered Petitioner's conviction fundamentally unfair ("Claim VII"). For the reasons stated herein, the federal habeas petition should be denied.

## I. PROCEDURAL HISTORY

This case comes before the court with a complicated procedural history. Petitioner originally filed his federal petition for habeas corpus on February 2, 2010, raising his first two claims for relief. *See* Docket No. 1. These claims were properly exhausted because Petitioner raised them on direct appeal in state court. Thereafter, on April 8, 2010, Petitioner filed an amended petition for habeas corpus in which he raised five additional claims for relief. *See* Docket No. 10. Recognizing that these additional claims were not properly exhausted, Petitioner requested that the court stay the federal proceedings while he exhausted his additional claims in state court through a state petition for habeas corpus. Docket Nos. 4 & 12. The motion to stay was denied and the unexhausted claims were stricken. Docket Nos. 15 & 19. Respondent was ordered to respond to the petition and submitted an answer on November 23, 2010, addressing Petitioners remaining two, properly exhausted, claims. Docket No. 46.

Thereafter, after the California Supreme Court denied Petitioner's state habeas petition, Petitioner was permitted to amend his petition a second time to include his, now properly exhausted, five additional claims. Docket Nos. 59, 62, 68. Respondent was order to submit an additional response addressing the additional claims and filed a supplemental answer on July 13, 2011. Respondent does not maintain that any of Petitioner's claims were not timely filed and, as such, all seven of Petitioner's claims are now properly before the court. *See* Supplemental Answer (Docket No. 83).

## II.  FACTUAL BACKGROUND[1]

Appellant [Petitioner] Simon Ranteesi brutally killed Milia Ranteesi, his estranged wife, bludgeoning her to death in the presence of their children.

A. Prosecution's Case

In August of 2002, appellant lived at 849 Topaz Circle in Vacaville with his four children: a daughter, 15-year-old R., and three sons, T. (then 17 years old), Je. (then four years old), and Jo. (then two years old). R. did not have a good relationship with appellant. The children's mother, Milia, had separated from their father in June of 2001 and had not lived in the family home for about a year. However, Milia, who worked night shifts at the Yolo County jail, would come to the house after she got off work to sleep and take care of the two younger boys while appellant was at work.

On August 6, 2002, R. came home around 2:00 or 3:00 p.m. in the afternoon to an empty house. About a half an hour later, her father and three brothers came home after having been out running errands. Unbeknownst to appellant, R. had made plans for Milia to take her to her maternal aunt's house in Burlingame for a long weekend, so R. could see her aunt and cousins. When appellant arrived home, he learned of R.'s plans and "wasn't happy about it" because he wanted her to stay home and help take care of her younger brothers. R. also testified that appellant did not want her to go because he thought "they [Milia's family] would just put things in [her] head to make [her] go against him."

R. and appellant got into an argument over her plans, with both of them yelling loudly. R. had packed a bag for the trip, and appellant and R. fought over the bag, appellant repeatedly unpacking it and R. repacking it each time he did so. Appellant also told R. four or five times that Milia would "pay for it" if she came and picked her up. According to R., over the past year, perhaps as long as the past two years, appellant had frequently said that Milia would "pay for it" for "going against him."

After the argument had gone on for a while, appellant went downstairs, and R. called Milia because appellant had been pushing her around. Shortly thereafter, Milia arrived at the house, pulling up in front of the driveway and calling R. on her cell phone to tell her she was outside. R. grabbed her bag, ran outside to her mother's car, and put her bag in the trunk. Appellant followed her outside and began arguing with Milia through the open passenger

---

[1]      The factual background is taken from the California Court of Appeal, First Appellate District decision on direct appeal from January 2009 and filed in this Court by Respondent on November 24, 2010 as Exhibit E (hereinafter referred to as the "Slip Op.").

window, telling her that "she would pay if she went against him" and that R. was not going on the trip.

At some point during the argument, appellant reached inside the car through the open passenger window and grabbed Milia's cell phone from the center console, demanding to know, "Who is listening into this conversation" and "Who do you think you are going to call?" He smashed the phone on the back end of one of his work trucks parked in the driveway, breaking it into pieces, prompting Milia to get out of the car and ask for her cell phone back. As the two argued over the phone, R.'s two younger brothers ran out of the house, so she put them in the backseat of the car to prevent them from getting hurt. In the meanwhile, R. was yelling at her mother to get in the car and go because she was scared of appellant.

Appellant then reached into the back of one of his pickup trucks and grabbed a metal jack. As he was doing so, T., who had come outside when he heard yelling and had been observing the argument from a few feet away, attempted to calm appellant and held his hand down, preventing appellant from removing the jack from the truck.

R., realizing she had forgotten to pack a shirt that she wanted to bring on the trip, got out of the car and ran back inside the house to retrieve it. FN3 Appellant again picked up the jack, this time chasing Milia around the car with it in his hand. When he caught up with her, he pushed her down and beat her over the head numerous times with the jack. T. tried to push him off but was unsuccessful, so he ran to get help. From inside the house, R. heard her mother scream and then T. yell, "God, no," so she grabbed a phone and ran back outside.

> FN3. The testimony on this point was inconsistent, with R. testifying that she had gotten into the car after putting her bag in the truck and T. testifying that she never got in the car.

By the time R. was outside, appellant was walking up the driveway towards the house, so she hid from him behind the trucks on the driveway. After he passed by, she ran down to the street to where her mother was lying on the ground and called 911. Appellant came back out a short time later, drying his hands on a towel. T., having since run back to where Milia was lying, testified that appellant then "just stood there," while R. described him as "content." T. yelled at his father, "What the hell is wrong with you? You just killed my mom. What is wrong with you?" Appellant, who was "real calm," just responded, "It's over." R. yelled at him, "You killed Mom. You killed Mom," to which appellant responded, "Oh, well."

4

Vacaville Police Sergeant Richard Elm, responding to a domestic violence call, was the first officer on the scene. When he arrived at the Ranteesi house, he saw appellant standing between two vehicles parked in front of the house. When the officer made eye contact with him, appellant put his hands in the air in a surrender position. When Officer Elm asked if he was the husband, appellant responded, "Yes." He then noticed Milia on the ground and asked, "Did you do this?" Appellant "placid[ly]" responded, "No." According to Officer Elm, appellant did not appear to be overwrought, angry, or upset. Appellant was then handcuffed without incident.

After other officers arrived and took custody of appellant, Officer Elm went over to Milia, who had "massive wounds to her face, and there was blood running down into the gutter." There was a metal object on the ground near Milia's head that had what appeared to be blood on it. Milia was pronounced dead at the scene.

The prosecution called several witnesses who testified about conversations they had had with appellant about his relationship with Milia. Denise Hall, who has friends that live in the Topaz Circle neighborhood, frequented a nearby park. In late 2001 or early 2002, she was at the park with her child and some friends when she encountered appellant, who was there with Je. and Jo. Ms. Hall was pushing one of appellant's boys and another child on a swing when appellant came over and struck up a conversation with her. He first thanked her for swinging his son and then quickly began talking about his wife leaving him, asking, "How can my wife leave me?" and "Do you think it's okay my wife can leave me?" Appellant repeatedly said, "She has to respect me," and also commented, "I don't know why American women do this. Back in my country, ... I can do whatever I want with a woman. If I want to kill her, I can, and nobody says a thing." When one of appellant's sons hurt himself on a swing and started crying, appellant told him, "Stop crying or I'm going to go home and beat your mother." Ms. Hall found the conversation uncomfortable, so she excused herself and walked away to join her friends.

Similarly, Ashik and Ramona Pavagadhi took their children to the neighborhood park on August 5, 2002, the day before Milia's death. Appellant was there, talking on his cell phone in a somewhat aggressive manner and appearing "a little distraught and upset" after hanging up. As his young sons were playing with the Pavagadhi's daughter, appellant struck up a conversation with them, talking about his wife and saying he was going to kill her. Mr. Pavagadhi asked where his wife was, and appellant responded that he did not know because she was no longer with him, but if he knew where she was, he was going to kill her. Appellant asked Mr. Pavagadhi, who was East Indian, if he was Farsi, and then asked what would happen in his culture if his wife left. Mr. Pavagadhi observed that appellant now lived in America where there are

rules; appellant responded that in his country, if his wife did something like that, she would be killed. Stating that he was still upset, appellant reiterated that if he found his wife, he would kill her.

David Levin, who lived on Topaz Circle, offered similar testimony. He had occasional conversations with appellant while they were outside with their respective children. On one occasion during the summer of 2002, they had a longer conversation than usual, and appellant matter-of-factly told him he and Milia were separated and she was no longer living in the house. He quoted a Bible passage about when a wife is not respectful to her husband or leaves him for another man, there was a price to pay. Appellant repeatedly commented, "What's a man supposed to do?"

B. The Defense

Appellant took the stand in his own defense. He testified that he was born in Jerusalem and came to the United States when he was 24 years old. After arriving in the United States, he married Milia and they had four children. For years, appellant worked as a welder to support the family while Milia attended school to study criminal justice. After graduation, she found employment as a correctional officer for the Yolo County Sheriff's Department.

Sometime in 2001, a neighbor informed appellant that he had seen Milia and a man together at a restaurant, "holding hands like lovers." Appellant confronted Milia, who initially denied that she was having an affair, claiming instead that she was helping a fellow employee with paperwork. She later admitted, however, that she had fallen in love with a man named Naseem Al-Harbi and wanted a divorce. She described Al-Harbi as a former Iraqi soldier who once worked as Saddam Hussein's bodyguard but then later worked for the FBI and was now seeking political asylum.

After learning this, appellant was scared because Al-Harbi was a "Muslim terrorist" who was terrorizing his family and wanted to take his wife. Because he was afraid an Iraqi soldier was going to kill his wife and children, he went to the FBI but was told there was nothing they could do if Al-Harbi had no relationship to the events of September 11, 2001. Consequently, appellant "just kept going on with [his] life." He and Milia worked out an arrangement whereby he remained in the home with the four children, and Milia, who worked nights at the jail, came during the day to take care of the younger children while appellant worked.

Appellant met Al-Harbi on one occasion when Milia introduced them to each other at a coffee shop. She told appellant that Al-Harbi had a bigger penis than him and could therefore beat him up.

6

Because of appellant's fears that Al-Harbi was going to kill his wife and children, he became very emotional, "sad and crying," feelings he shared with a lot of people, such as people at the neighborhood park and work as well as his pastor. One woman in whom he confided at the park suggested he go see a doctor, which he did sometime around July of 2002. Appellant explained to the doctor that he was sad about Milia and was crying a lot, so the doctor prescribed Paxil and told him it would make him happy. He began taking the medication in July of 2002 as prescribed. He would take one pill around 5:00 p.m. and it would make him sleepy.

On the afternoon of August 6, 2002, appellant came home around 3:00 p.m. and found R. in her bedroom packing a suitcase to go to her aunt's house for a few days. Appellant told her she could not go because he needed her around the house. According to appellant's testimony, he was "[k]ind of" angry and frustrated and was just telling her, "You can't go. I need you. You cannot go." As they were having this discussion, appellant kept unpacking R.'s luggage, and she kept packing it back up again. R. called Milia and had appellant talk to her, and it was agreed that R. would not leave. Appellant denied he was upset during the confrontation but claimed he was "very nervous." After he and Milia agreed R. would not leave, he went downstairs, took a Paxil, and fell asleep on the dining room floor.

Some time later appellant was awakened by T., who told him that Milia was there. He went outside and saw R. putting her luggage in the trunk of Milia's car and Milia sitting in the driver's seat. He walked up to the car, took the luggage out, and told R. she was not leaving. R. was "[k]ind of" yelling, saying she was going and putting the luggage back in. After getting out of the car and walking to the trunk, Milia told R. to call the police, so appellant reached into the front seat of the car, grabbed Milia's cell phone, and broke it on the side of one of his work trucks parked in the driveway.

Suddenly, according to appellant, Milia just "came at" him and "fell down on the ground." The next thing he knew, T. was telling him, "Look what you did." He did not know what he had done, but he saw Milia lying on the ground. Because he started feeling scared, he went inside to put water on his face, and then went back outside to look at Milia. He stood there "waiting for the police to explain to [him] what happened."

When a police officer arrived, appellant raised his hands, and the officer handcuffed him and put him on his knees. He was then taken to the police station. While there, appellant felt scared and worried about Milia, "thinking about the boyfriend and how come he's [an] Iraqi soldier...."

7

On cross-examination appellant acknowledged that he had been arrested in November of 2001, but denied he threatened to kill or punch Milia, threatened to kill R. if she called the police, or threw Jo. at Milia. He claimed that these were all lies told by Milia in order to have him arrested.

Appellant also denied that he was mad at Milia about her leaving him. He testified "I was sad and crying. I wasn't angry." And, he explained, "In the United States, wom[e]n do whatever they want, and she wanted to leave me, and we had agreed on the divorce, and we had agreed I take the house and the kids, and I wasn't mad at her or nothing. I was just sad."

As to the events on August 6, 2002, appellant denied that he got angry with R. over her plan to go to her aunt's house. He claimed instead that he just unpacked her bag and told her she could not go, denying that he ever told her there would be consequences if Milia took her away. And when Milia had arrived to pick R. up, despite telling him on the phone she would not come to the house, he was not angry but simply took her bag out of the car: "It was no yelling, nothing. I just didn't want her to leave. I took the bags back out of the trunk." When asked if he was mad when he took the phone out of Milia's car and broke it, he claimed he was "angry at the phone." He also testified he never argued with Milia before she "came in at" him, and he had no memory of "hitting her or anything." When asked whether he remembered what happened from the time when Milia got out of the car until she was lying on the ground, appellant responded: "I don't remember. I lost it. I became totally insane." He also denied going inside to wash off his bloody hands, saying that he only went inside to put water on his face because he was getting scared "[b]ecause what happened from the effect of the drug." He explained that "[t]he Paxil caused [him] to get scared."

Appellant also denied that he spoke to any neighbor while waiting for the police, denied that he responded, "Oh, well" when T. said, "Look what you did," and denied that he responded, "Well, it's all over now" when R. said, "You killed her." Instead, according to appellant, nobody talked to him and everyone kept quiet while he was waiting for the police to arrive.

Defense counsel also presented testimony from three of appellant's co-workers from the company where he worked as a welder. They consistently testified that he had been a good employee until about a year prior to Milia's death, when his performance changed. He no longer focused on his work, his productivity declined, and he spent his work time talking obsessively about one particular subject, sometimes to himself and other times cornering co-workers who were forced to either ask him to stop talking or simply walk away.

Defense counsel also called two of appellant's neighbors. Jeffrey Belt lived down the street from appellant and was passing by

appellant's house around 5:00 p.m. on the day of Milia's death when he saw appellant and Milia arguing on the sidewalk in front of their house. As Belt described it, Milia "was pretty much yelling and screaming and waving her arms towards" appellant.

Vernon Gandy, a retired minister, was also a neighbor of appellant's and they talked on many occasions "neighbor to neighbor ." Some time during the year prior to Milia's death, appellant sought out Gandy's counsel about his personal problems, and Gandy would refer to the Bible, often quoting Scripture concerning forgiveness and loving.

Mike McCamey, a pastor at a church in Fairfield who often counseled parishioners in times of personal crisis, also testified. A number of months prior to August of 2002, McCamey met appellant when he started attending worship services and Bible study classes. At some point, McCamey learned appellant was struggling with some family issues and approached appellant and offered to speak to him privately. Appellant was responsive to this suggestion and they later met in McCamey's office at the church. Appellant, whom he described as "very friendly, very open," was concerned about the condition of his family and seemed frightened.

McCamey also accompanied appellant to the county courthouse the day before Milia's death. According to McCamey, appellant was aggressively pursuing reconciliation, including, against Milia's wishes, putting his hand on her knee and verbally attempting to convince her to return home. In response, Milia told him something to the effect of, "The children are afraid of you. I'm afraid of you, and I will not consider talking to you about coming home until you get your anger under control."

The defense also called four expert witnesses who offered testimony regarding appellant's mental state. The first was Dr. Carlton Purviance who, as noted above, was a clinical and forensic psychologist retained by the public defender's office in 2002 to assess appellant's competency to stand trial. He met with appellant on five separate occasions, the first interview occurring on August 12, 2002, just six days after Milia's death, and lasting approximately one hour. Dr. Purviance described appellant's behavior during that visit as "frightened," "very anxious," and "pressured." Appellant's speech was "very rapid, very intense," and "rambling": "[T]he topics of his speech often went from one to another without much connectiveness between them. He would begin a speech and then he would just sort of ramble from topic to topic without there being a good link between them." Additionally, he "expressed a number of delusional, paranoid delusional beliefs.... He was very frightened. In fact, terrified would be a better word." According to Dr. Purviance, appellant was "very concerned" about a particular "set of ideas" to which he kept going back.

9

Dr. Purviance conducted a second interview on September 5, 2002, and found appellant, who had been refusing psychiatric treatment in jail, "even more alarmed and frightened" than during the initial visit. Appellant related an incident in which he found a bar of soap in his cell and expressed to Dr. Purviance that it had been planted there as a sign his life was in danger. His speech was still "pressured" and it was very difficult for Dr. Purviance to get information from him, because he was "completely preoccupied with these delusional ideas that he was, you know, going to be harmed; that he was being persecuted."

After the two meetings, Dr. Purviance concluded that appellant was suffering from persecutory-type delusional disorder. When defense counsel asked Dr. Purviance to describe the specific characteristics of appellant's delusions that led to the diagnosis, the prosecutor objected, which objection the trial court sustained, explaining, "I think you're limited to a description from this mental health professional as to the diagnosis of, in this case, Mr. Ranteesi, but not the information-this jury is not going to hear the information that forms the basis for the opinion by this expert. I don't think that that is appropriate based on the abolition of the diminished capacity defense."

Dr. Purviance's testimony then continued. He met with appellant a third time on November 13, 2002, testifying that his demeanor "was very much the same. Again, he was ... highly agitated, pressured, actively psychotic, speech was rambling. Affect was one of intense fear and anger. He was very convinced of his delusional beliefs. He did not think there was anything wrong with him psychiatrically, and there had been little or no significant change over that 13 weeks." Several clinical signs, including that fact that appellant was denying that he was mentally ill, indicated to Dr. Purviance that appellant was not malingering. According to Dr. Purviance, someone who is malingering attempts to exaggerate a psychiatric disorder, while appellant was "outraged that it was even thought there might be something wrong with him mentally." At the conclusion of the meeting, Dr. Purviance was of the opinion that appellant suffered from delusional disorder with grandiose and persecutory features. Dr. Purviance explained that in someone suffering from such a disorder, "areas of a person's functioning can be fairly intact, but certainly within that set of delusional ideas, cognitive processes are greatly distorted" and could affect the person's mental state on a continuing basis. Delusional disorder usually grows in scope and can affect an individual's judgment.

On cross-examination, Dr. Purviance acknowledged that he was aware of an alleged domestic violence incident of November 11, 2001, and that appellant had not been prescribed Paxil until July of 2002. Dr. Purviance conceded, therefore, that Paxil could not have been an excuse for the 2001 domestic violence incident. He also agreed that the 2001 incident reflected a lot of anger by appellant

10

against Milia and R.

As to his diagnosis of appellant, Dr. Purvince conceded that controversy exists concerning the practice of rendering a retrospective diagnosis, or diagnosing what someone's mental state was on a date in the past, admitting "You can reliably diagnose what you see at the moment. It's difficult to diagnose a person for some distant date". He also agreed that a diagnosis is increasingly controversial the further back in time it goes. When the prosecutor asked, "[Y]ou weren't back there in time like on August 6th of the year 2002 when he killed his wife to see what he looked like, what he was saying, how he was acting?", Dr. Purvince answered, "That's correct." He also conceded that someone suffering from a delusional disorder can still get angry at someone and want to kill him or her, can figure out ways to kill, and can accomplish the killing.

Dr. Purvince also acknowledged on cross-examination that Al-Harbi was a real individual who formerly served as an Iraqi soldier in Saddam Hussein's army and was in jail while seeking asylum. He admitted that because these facts were true, appellant was not delusional about these matters.

On redirect, however, Dr. Purvince clarified that those were not the sole facts concerning Al-Harbi that lead to appellant's delusional disorder diagnosis. He explained: "[Appellant] believed that this man was a double agent working for not only Saddam Hussein, but Osama Bin Laden and was a double agent working for the CIA and the FBI, and this man had been planted in the Yolo County jail to have a coercive influence over his wife." He further detailed appellant's delusions: "Well, as time went on, he suspected that his wife had been medically altered as a result of this plot; that a bar of soap had been planted in his cell a few days after he got to the jail which was a sign to him that he was going to be killed."

The second expert witness to testify on appellant's behalf was Dr. Kyung Minn, who in August of 2002 worked part-time as a psychiatrist in the Solano County jail. Dr. Minn saw appellant on August 8, 2002 in a 20- to 40-minute meeting, during which time he found appellant "calm and coherent." He concluded, based on beliefs of appellant's that were "possible, but ... very, very unlikely," that he was suffering from delusional disorder with a paranoid aspect.

Appellant's third expert was Dr. Purna Datta, a clinical psychologist with a Ph.D. in neuropsychology with cognitive behavior therapy. Following a referral by the court to evaluate appellant for his competency to stand trial, Dr. Datta spent two and a half hours interviewing and testing appellant on October 9, 2002. During the interview, Dr. Datta initially found appellant to be agitated and angry, but he became more cooperative as the

interview progressed. The doctor did not detect pressured speech or rambling thoughts, instead finding appellant's speech "clear and understandable," although becoming rapid at times when he spoke about Milia.

Based on the interview, Dr. Datta concluded appellant suffered from "pretty severe" delusional disorder with a persecutory aspect. He believed appellant had been suffering from the disorder for many years, possibly as far back as the second year of his marriage to Milia in 1985. He also diagnosed appellant as suffering from depression. Dr. Datta suggested to appellant that he needed medication to treat his disorder, but appellant refused, also revealing that he had taken Paxil prior to the incident.

On cross-examination Dr. Datta acknowledged that, in order to render a diagnosis of delusional disorder, he first had to rule out that appellant's behaviors were caused by a chemical substance or medication. He agreed with defense counsel when asked, "So in this particular case, you were certain that whatever problems you thought he may have had were not caused by the Paxil, true?" He also agreed with defense counsel that one of the aspects of appellant's delusional disorder was that Milia was having an affair outside the marriage. Dr. Datta disagreed, however, with defense counsel's question as to whether someone with delusional disorder can still intend to kill somebody.

Dr. Stewart Shipko, a psychiatrist with subspecialties in the diagnosis and treatment of panic disorder and in the adverse effects of Selective Serotonin Reuptake Inhibitors (SSRIs), was the final expert on appellant's behalf. Having been asked by defense counsel to conduct an evaluation of appellant, Dr. Shipko reviewed the police report pertaining to Milia's death, the medical examiner's report and autopsy, multiple psychological evaluations, police reports on two prior domestic violence incidents, and the videotape of a three-hour police interview of appellant shortly after his arrest. Dr. Shipko also interviewed appellant on June 9, 2006, although he terminated the interview after half an hour because he did not feel he was getting reliable and credible answers from appellant.

Dr. Shipko began by describing the potential adverse side effects of SSRIs, a category of antidepressants that includes Paxil. The most severe side effects include agitation, depression, mania, disinhibition, suicide, aggression, and addiction, and typically occur within the first month of taking the drug. As to Paxil specifically, Dr. Shipko prescribed it frequently in the 1990's, but by 2002 he stopped prescribing it for new patients because the incidents of side effects, particularly addiction and withdrawal problems, were too high. In his experience, doctors do not take the time to thoroughly describe the risks associated with SSRIs to their patients. He conceded on cross-examination, however, that he never met the doctor who prescribed Paxil to appellant and did not

know his practices.FN4

FN4. The doctor was deceased at the time of trial.

Dr. Shipko then offered his opinion concerning appellant's mental state at the time he killed Milia: "I thought that he had hostility, aggression, and impulsivity that emerged out of a Paxil-induced manic state. You would refer to that technically as a substance-induced mood disorder of the manic type." When asked by defense counsel, "In your experience, are one of the side effects loss of memory as a result of taking Paxil?", Dr. Shipko responded, "Memory loss can occur short-term and long-term. And when individuals commit particularly violent acts, they generally do not have a recall of doing that."

On cross-examination, Dr. Shipko acknowledged that he had never "interviewed a killer who was on an antidepressant like Paxil at the time of the crime and said they couldn't remember." He also acknowledged that, while he has prescribed Paxil to several hundreds of patients over the years, none of his patients killed anyone while on Paxil or other antidepressants. He also agreed with the prosecutor that appellant "had a lot of reasons in his own mind to kill his wife other than Paxil," commenting, "He had a history of being abusive." And he agreed with the prosecutor that "[a]bsent any other factors, a general person taking Paxil has the ability to make a plan to kill" and carry it out. Finally, Dr. Shipko conceded that he never asked appellant, "Did you know that you were killing your wife?" The prosecutor subsequently inquired, "Did you ask him if he remembered killing his wife," to which Dr. Shipko responded, "I think I did ask him," recalling that appellant said no.

C. Prosecution's Rebuttal Evidence

R. took the stand a second time to describe a domestic violence incident that occurred on November 11, 2001 at the Ranteesi home. Milia and appellant were arguing about the divorce and whether or not she could take the children. Appellant told her that if she tried to take the children, he would kill her. When R. got involved in the argument, appellant pushed her up against the wall "a couple of times." He then pushed Milia's head into the living room couch while yelling at and threatening her. R. got on top of appellant and bit him, and appellant responded by telling her he would kill her and that he was "going to poke [her] mother's eyes out." When he finally got off of Milia, she tried to get away but ended up on the floor; while she was down, appellant picked Jo. up over his head and "tossed him at her." Jo. started crying and Milia caught him. When R. attempted to call the police, appellant threatened her, saying he would kill her and Milia if she did so. R. nevertheless made the call, while appellant and Milia continued to argue. Appellant unsuccessfully attempted to leave the house

before the police arrived. R. gave a statement to the police that was consistent with her testimony in court.

On cross-examination R. admitted that, months after the incident, she wrote a letter requesting that the charges against appellant be dropped, claiming that the accusations she made were false. Confirming that her testimony in court was the truth, R. explained that she lied in the letter because she was "scared" and appellant "kept threatening us."

Alfredo Morales, a neighbor who lived down the street, also testified in rebuttal. He was at home one day when someone banged on his door and said that appellant had just killed his wife. He went outside and crossed the street to where appellant was standing over Milia, who was lying on the driveway. Her face was disfigured and there was blood on the driveway. Morales said to appellant, "Simon, what did you-what have you done?" Appellant, who looked "dazed" and "pale" as if he was "in shock," responded, "I killed her. I killed my wife." Morales then asked him, "What about the children?" Appellant responded, "You watch over them. You take care of them." Morales, who waited next to appellant until the police arrived, did not recall appellant putting his hands up like he was surrendering.

## III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States.  *See* 28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

1    In applying AEDPA's standards, the federal court must "identify the state court decision

2    that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

3    "The relevant state court determination for purposes of AEDPA review is the last reasoned state

4    court decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

5    "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

6    orders upholding that judgment or rejecting same claim rest upon the same ground." *Ylst v.*

7    *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

8    must conduct an independent review of the record to determine whether the state court clearly

9    erred in its application of controlling federal law, and whether the state court's decision was

10   objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The

11   question under AEDPA is not whether a federal court believes the state court's determination

12   was incorrect but whether that determination was unreasonable—a substantially higher

13   threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

14   "When it is clear, however, that the state court has not decided an issue, we review that question

15   *de novo*." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

16   545 U.S. 374, 377 (2005)).

17                    IV.  ANALYSIS OF PETITIONER'S CLAIMS

18         1.  Claim I

19         In Claim I, Petitioner contends that his conviction must be set aside because the trial court

20   refused to admit the defense experts' testimony regarding Petitioner's mental state.  Specifically,

21   while experts were allowed to testify regarding their diagnosis of Petitioner's mental condition,

22   they were precluded from testifying as to the specific matters that formed the basis for their

23   opinions that he suffered from delusional disorder.  As detailed above, during trial Dr. Purviance

24   opined that appellant was psychotic and suffered from delusional disorder of a persecutory type.

25   The following colloquy then ensued:

26   / / /

                                         15

1    [Defense counsel]: What specific characteristics about Mr.
Ranteesi's delusions did you base your opinion on that made you
2    believe it was a delusional disorder as opposed to something else?

3    [Dr. Purviance]: Well, the content of the delusions, and I'll
describe those for you, if you want-clearly had the themes of him
4    being at risk. He thought he was going to be killed; that he-that
people were orchestrating plots against him. So you know, the
5    content of his delusions are what helped me to arrive at what type
of a delusional disorder it was.
6

7    [Defense counsel]: And can you give us an example of something
that you felt was a delusion as opposed to something that would
have occurred in real life?
8

9    [Dr. Purviance]: With respect to Mr. Ranteesi?

10    [Defense counsel]: With respect to Mr. Ranteesi.

    [Prosecutor]: I'm going to object to the detailed basis for the
11    opinion.

12    The Court: Sustained.

13    [Defense counsel]: I would note that it is a delusional disorder as
opposed to other mental disorders, psychotic disorders, and that
14    what the individual says is basically the basis for the opinion
rendered.
15

    The Court: Well, that's fine, but I think you're limited to a
16    description from this mental health professional as to the diagnoses
of, in this case, Mr. Ranteesi, but not the information-this jury is
17    not going to hear the information that forms the basis for the
opinion by this expert. I don't think that that is appropriate based
18    on the abolition of the diminished capacity defense.

19  Rep.'s Tr. at 600.

20      Petitioner claims that the trial court's ruling prejudiced his defense because it

21  undermined his experts' credibility offered to demonstrate that he had a mental disease, defect, or

22  disorder and did not form the relevant specific intent.  Because Petitioner's sole defense was that

23  he lacked the mental state required to be convicted of first degree murder, Petitioner argues the

24  ruling violated his right to establish a defense under the Fourteenth Amendment.

25      On appeal, the California Court of Appeal concluded that Dr. Purviance, as well as the

26  other experts who testified at trial, should have been able to testify about the information that

1    formed their belief that Petitioner was delusional because it was relevant in determining whether

2    Petitioner formed the mental state required for murder, and the exclusion of the testimony

3    violated Petitioner's due process rights.  The court, however, determined that the error was

4    harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24 (1967),

5    because the jury received ample evidence of Petitioner's delusions through the expert testimony

6    and Petitioner's own trial testimony.  Furthermore, the Court of Appeal concluded that the

7    evidence of Petitioner's intention to kill his estranged wife was "overwhelming": "In

8    combination with the overwhelming evidence of appellant's guilt, including testimony from

9    multiple sources that he said he wanted to kill Milia, the omission fo some specifics did not

10   contribute to the jury's verdict."  *See* Slip Op. at 24-25.

11                      i. The Expert Testimony

12        At trial, four experts testified for the defense, three about Petitioner's delusions and one

13   as to the effects of the prescription drug Paxil, which Petitioner was prescribed for depression at

14   the time of the homicide.

15        The first expert to testify for the defense was Dr. Carlton Purviance, a clinical and

16   forensic psychologist.  Rep.'s Tr. at 590.  Dr. Purviance had met Petitioner on five separate

17   occasions.  *Id.*  He testified that Petitioner had expressed "a number of delusional, paranoid

18   delusional beliefs" and he was "terrified."  *Id.* at 593-94.  At the doctor's second visit with

19   Petitioner, Petitioner was refusing psychological treatment in jail and "he had found a bar of soap

20   in his cell, which terrified him.  The bar of soap, to him, had been planted there as a sign that he

21   was at great risk, his life was at risk."  *Id.* at 596.  Later, on re-direct examination, Dr. Purviance

22   testified that Petitioner believed Al-Harbi, Malia's boyfriend, was "a double agent working for

23   not only Saddam Hussein, but Osama Bin Laden and was a double agent working for the CIA

24   and the FBI, and this man had been planted in the Yolo County jail to have a coercive influence

25   over his wife."  *Id.* at 643.  "[A]s time went on, he suspected that his wife had been medically

26   altered as a result of this plot; that a bar of soap had been planted in his cell a few days after he

got to the jail which was a sign to him that he was going to be killed." *Id.* at 643-44.  Petitioner
was afraid that Al-Harbi would harm him or his family. *Id.* at 645.  Dr. Purviance opined that
Petitioner's symptoms led him to believe Petitioner was psychotic and suffering from a
delusional disorder of a persecutory type.  *Id.* at 597-99.  Petitioner was suffering from these
delusions for at least a year, meaning that he was suffering from them since before he killed his
wife. *Id.* at 599.  According to Dr. Purviance, a delusional disorder could affect an individual's
judgement as it related to the objects of the delusions.  *Id.* at 605.

On cross-examination, Dr. Purviance testified that he had learned that Al-Harbi was a
former Iraqi soldier who had defected and been granted asylum in the United States.  *Id.* at 624.
The doctor agreed that, as these facts were true, they were not a part of any of Petitioner's
delusions and that Petitioner did not like Al-Harbi as a result of those facts.  *Id.* a 626.  Petitioner
had initially denied any involvement in his wife's murder, but eventually told the doctor that "the
Paxil made me do it." *Id.* at 628.  Later in the cross-examination, Dr. Purviance testified that
Petitioner's wife had been "incorporated into this delusional system" and that Petitioner may
have feared her on the day he killed her.  *Id.* at 632.

Dr. Purviance also testified that a person suffering from a delusional disorder could still
be capable of committing murder.  Given a hypothetical where a person, as a result of a delusion,
believed their spouse was having an affair with his or her boss, when their relationship was, in
fact, completely professional, Dr. Purviance agreed that the person suffering from the delusions
was still capable of forming the specific intent for murder in killing the spouse.  *Id.* at 633-34.
Dr. Purviance also testified that in interviewing Petitioner he was attempting to diagnose his
current mental disorder, i.e. after the homicide not at the time of the homicide.  He stated that he
has not "really offered any opinions as to what I think the connection is between this mental state
and this homicide." *Id.* at 640.

The next expert called on Petitioner's behalf was Doctor Kyung Minn, a psychiatrist who
treated Petitioner as a result of his employment at the Solano County Jail. *Id.* at 654.  Petitioner

1  informed Dr. Minn that he was taking a prescription for Paxil, 20 milligrams a day. *Id.* at 658.

2  Like Dr. Purviance, Dr. Minn concluded that Petitioner was suffering from a delusional disorder.

3  *Id.* at 659.  Also like Dr. Purviance, Dr. Minn was only testifying about his initial diagnosis of

4  Petitioner after the incident, and not offering any opinion as to why Petitioner killed his wife.

5  *Id.* at 663.

6        The third expert to testify on Petitioner's behalf was Doctor Purna Datta, a clinical

7  psychologist who was appointed by the court to examine Petitioner to determine whether he was

8  competent to stand trial.  Like the two other experts, Dr. Datta concluded in his one meeting with

9  Petitioner that Petitioner was suffering from a delusional disorder of the persecutory type that

10 was "pretty severe." *Id.* at 672, 675.  Dr. Datta also diagnosed Petitioner as being depressed. *Id.*

11 at 675.  Petitioner denied killing his wife, did not say that the Paxil had made him do it, and

12 stated that Malia must have tripped and fallen on a metal object. *Id.* at 684.  Dr. Datta did not see

13 a link between Petitioner's delusional disorder and an inability to form the intent to kill. *Id.* at

14 686.

15       The last expert called by the defense was Dr. Stewart Shipko.  Dr. Shipko's testimony is

16 set forth in more detail as it relates to claim II, *infra*.  Suffice it to say for purposes of this claim

17 that Dr. Shipko opined that the amount of Paxil prescribed to Petitioner could not have put him

18 into an unconscious state and that a person on Paxil was capable of forming the intent to kill.

19                     ii.  Petitioner's Testimony

20       Petitioner testified that he believed Al-Harbi was a "Muslim terrorist" and that he had

21 called the FBI but the FBI had refused to investigate. *Id.* at 429.  He also said that he was scared

22 that Al-Harbi, a former Iraqi soldier, was going to kill his wife and children. *Id.* at 433.  When

23 asked about killing Malia, he testified: "I don't remember.  I lost it.  I became totally insane." *Id.*

24 at 470; *see also id.* at 468-69.  Petitioner also told the jury he had been taking the medication

25 Paxil, and that on the day he killed Malia he was scared "[b]ecause what happened from the

26 effect of the drug." *Id.* at 470-71.  He explained that "[t]he Paxil caused [him] to get scared."

1    *Id.* at 471.

2             iii. Other Testimony Relating to Mental State

3       Several witnesses testified about conversations they had with Petitioner regarding his

4 wife's actions. *See, e.g.*, Rep.'s Tr. at 340, 350, 366, 376.  A woman with whom Petitioner

5 struck up a conversation with at a local park testified that Petitioner asked her "How can my wife

6 leave me?" and "Do you think it's okay my wife can leave me?"  Rep.'s Tr. at 340-41.  Petitioner

7 repeatedly stated "She has to respect me," and said "I don't know why American women do this.

8 Back in my country, . . . I can do whatever I want with a woman.  If I want to kill her, I can, and

9 nobody says a thing."  *Id.*; *see also id.* at 379 (similar testimony from a different witness to a

10 different conversation).  The woman also heard Petitioner tell his child to stop crying or he would

11 beat the child's mother.  *Id.*  In the evening of the day before Milia's death, August 5, 2002,

12 Petitioner had a conversation with a couple at the park and, appearing "a little distraught and

13 upset," told the gentleman that he was "going to kill his wife."  *Id.* at 367.  He said that he did not

14 know where his wife was, but that if he knew where she was, "he was going to kill her."  *Id.* at

15 368.  Petitioner admitted that he went to the park with his children often, but denied making any

16 statements that he was going to kill his wife.  *Id.* at 433, 456-59.

17       Petitioner and the victim's daughter, R., testified that on the following day, the day of her

18 mother's death, her mother was supposed to pick her up to take her to her aunt's house.  *Id.* at

19 224.  R. testified that her father did not want her to go and that they argued loudly.  *Id.* at 225-28.

20 Four or five times Petitioner stated that if Milia picked R. up, Milia would "pay for it."  *Id.* at

21 228.  Petitioner had frequently stated that Milia would "pay for it" for "going against him."  *Id.*

22 When Milia showed up to pick up R., Petitioner told Milia directly that "she would pay if she

23 went against him" and that R. was not to go to her aunt's house.  *Id.* at 231.  During the

24 argument, Petitioner reached into Malia's car and removed her cell phone, saying he was afraid

25 that she would call the police.  *Id.* at 234.  He smashed it against his truck parked in the

26 driveway, breaking it into pieces.  *Id.*  As the argument between Malia and Petitioner escalated,

1  he obtained a metal jack from his truck and chased her until he caught up with her and beat her

2  over the head numerous times with the jack, killing her.  *Id.* at 240.  R.'s brother, T., repeated a

3  similar course of events.  *Id.* at 280-305.  After T. witnessed Petitioner hit his mother in the face

4  with the jack five or six times, he yelled at Petitioner "What the hell is wrong with you?  You

5  just killed my mom.  What is wrong with you?"  Petitioner responded: "It's over."  *Id.* at 304.

6                    iv.  Any Potential Error Was Harmless

7          Assuming that the exclusion of the experts' testimony violated Petitioner's constitutional

8  right to due process, the state court correctly concluded that any error was harmless.  When a

9  petitioner seeks collateral relief from a state-court judgment, a federal court employs a less

10 stringent harmless error analysis, whether the "error 'had substantial and injurious effect or

11 influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)

12 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see Fry v. Pliler*, 551 U.S. 112

13 (2007) (holding that "in § 2254 proceedings a court must assess the prejudicial impact of

14 constitutional error in a state-court criminal trial under the 'substantial and injurious effect'

15 standard set forth in *Brecht* . . . whether or not the state appellate court recognized the error and

16 reviewed it for harmlessness under . . . *Chapman*").  The *Brecht* standard requires reversal only

17 if, but for the error, there is "a reasonable probability" that the jury would have reached a

18 different result.  *Clark v. Brown*, 450 F.3d 898, 916 (9th Cir. 2006).

19         First, the jury heard ample evidence regarding Petitioner's delusions from Petitioner's

20 own testimony.  *See, e.g.*, Rep.'s Tr. at 422.  The jury also learned about Petitioner's delusions

21 through the expert testimony that was allowed into evidence.  Dr. Purvance testified that

22 Petitioner believed that Al-Harbi was a double agent working for not only Saddam Hussein, but

23 Osama bin Laden, the CIA, and the FBI who had been planted at the jail where Malia worked as

24 a correctional officer in order to create a coercive influence over her.  Petitioner also believed

25 there was a conspiracy to kill him, that a bar of soap planted in his cell was evidence of the

26 conspiracy, and that Malia had been surgically altered as part of this conspiracy.

1    Ultimately, had the jury learned each and every detail of Petitioner's delusions that

2 formed the basis of the experts' opinions, it is unclear how this would have affected their

3 conclusion that Petitioner was guilty of first degree murder.   Petitioner fails to allege how the

4 specific basis of the experts' opinions would have shown his inability to form the necessary

5 mental state.   Petitioner argues that "[t]he defense's testifying experts were disallowed from

6 presenting the necessary background information on [Petitioner's] mental condition to show that

7 he was not in possession at that time of sufficient rational thought to be able to form the 'required

8 specific intent' necessary to be guilty of the crime of first degree murder."   However, the experts

9 who testified on Petitioner's behalf about his delusions agreed that a person who suffers from

10 delusions is still capable of forming the intent to kill—nothing about the alleged error changed

11 this opinion.   The delusions may explain *why* Petitioner killed his wife, and perhaps would have

12 supported an insanity defense (a course Petitioner chose not to follow), but the delusions do little

13 to show that Petitioner lacked the specific intent to kill his wife, for whatever reason it may have

14 been.   In other words, had the members of the jury learned of the extent of Petitioner's delusions,

15 they may have determined that Petitioner intended to kill his wife because of her role in

16 Petitioner's delusions, and not her infidelity, but this does not negate Petitioner's intent to kill his

17 wife.   The only potential testimony that Petitioner lacked the mental state required for first degree

18 murder is Petitioner's own testimony that he "lost it" and did not remember killing his wife and

19 that the Paxil made him do it.   That evidence was not withheld from the jury.

20    In addition to the expert testimony about Petitioner's delusions, Dr. Shipko testified about

21 the effects of Paxil and opined that at the time Petitioner killed Malia, he was experiencing a

22 "substance-induced mood disorder of the manic type" and that he "had hostility, aggression, and

23 impulsivity that emerged out of a Paxil-induced manic state."   Thus, the jury was offered

24 substantial evidence about Petitioner's delusions as well as the effect of the medication he was

25 prescribed.   However, as discussed more fully below in Claim II, Dr. Shipko opined that Paxil

26 did not cause Petitioner to enter a state of unconsciousness and agreed that a person under the

influence of Paxil in the amount that Petitioner prescribed was capable of forming the intent to kill.  Thus, any additional testimony from Dr. Shipko as to the basis of this opinion would not have supported a defense on the theory that Petitioner did not form the requisite intent.

Finally, balanced against the evidence of Petitioner's delusions and Paxil prescription, was the strong evidence that Petitioner had formed the intent to kill necessary for the jury to convict him of first degree murder.  Petitioner, originally from the Middle East, learned that after his wife moved out of their home she began a relationship with Al-Harbi.  Petitioner had several conversations with others about his culture, and that where he was from a wife who cheated on her husband could be killed.  Most telling, the day before the homicide Petitioner told a stranger at the park that he did not know where his wife was, but that if he found her he intended to kill her.  Petitioner and the victim's daughter also testified about the argument that led up to the homicide and that Petitioner said Malia would "pay for it" for "going against him."

The jury was presented with evidence that Petitioner suffered from delusions and was potentially in a medically induced manic state at the time he killed his wife.  Any additional evidence that should have been heard by the jury but for the trial court's inaccurate evidentiary ruling would not have had a significant effect upon the evidence presented to the jury.  The jury received strong evidence that Petitioner intended to kill his wife.  Because the additional evidence Petitioner urges this court to consider was not particularly helpful to Petitioner's defense, and the strong evidence of Petitioner's intent to kill, the error did not have a substantial and injurious effect upon the jury's verdict, and is thus harmless.

2. Claim II

In Claim II, Petitioner contends that the trial court erred in refusing to give the jury instructions regarding unconsciousness due to involuntary intoxication.  The California Court of Appeal concluded that there was no error because substantial evidence had not been presented warranting the instruction:

Appellant also contends the trial court violated his rights to a trial

23

by jury and due process by denying his request for instructions on unconsciousness by involuntary intoxication (CALCRIM 3425 and CALCRIM 3427). FN7 His request for the instructions was based on his theory that his attack on Milia was driven by the Paxil he was taking for depression. As appellant explains it, Dr. Shipko testified to the adverse side effects of Paxil as detailed above, and then opined that at the time appellant killed Milia, he "was in a Paxil-induced manic state as a result of an adverse reaction to his prescribed medication and was not in control of his responses to events." In further support appellant notes his own testimony that when he was prescribed Paxil, his doctor did not inform him of the potential adverse side effects, that he had "gone insane" and "lost it" when he attacked Milia, and that he had "not acted with an awareness of his actions" instead waiting for the police to arrive and tell him what had happened.

> FN7. CALCRIM 3425 provides, "The defendant is not guilty of _____ if he/she acted while legally unconscious. Someone is legally unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.] [¶] Unconsciousness may be caused by.... [¶] The People must prove beyond a reasonable doubt that the defendant was conscious when he/she acted. If there is proof beyond a reasonable doubt that the defendant acted as if he/she were conscious, you should conclude that he/she was conscious. If, however, based on all the evidence, you have a reasonable doubt that he/she was conscious, you must find him/her not guilty."
>
> CALCRIM 3427 provides, "Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required (intent/ [or] mental state) when he/she acted. [¶] A person is involuntarily intoxicated if he or she unknowingly ingested some intoxicating liquor, drug, or other substance, or if his or her intoxication is caused by the force, duress, fraud, or trickery of someone else, for whatever purpose[, without any fault on the part of the intoxicated person]."

Pursuant to section 26, subdivision (4), unconsciousness is a complete defense to a criminal charge except where caused by voluntary intoxication. (§ 26, subd. (4); *People v. Heffington* (1973) 32 Cal.App.3d 1, 8.) As the California Supreme Court recently summarized in *People v. Halvorsen* (2007) 42 Cal.4th 379, 417: "Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge. [Citations.] To constitute a defense, unconsciousness need not rise to the level of a coma or inability to walk or perform manual

movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' [Citation.] If the defense presents substantial evidence of unconsciousness, the trial court errs in refusing to instruct on its effect as a complete defense. [Citations.]" Substantial evidence in this context means " ' " 'evidence from which a jury composed of reasonable [people] could have concluded.' " that the particular facts underlying the instruction did exist.' " (*People v. Lemus* (1988) 203 Cal.App.3d 470, 477, quoting *People v. Wickersham* (1982) 32 Cal.3d 307, 324.) Having conducted an independent examination of the record under a de novo standard of review (*People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584), we conclude it does not contain substantial evidence to support the defense instruction.

As noted, appellant relies exclusively on his own testimony and that of Dr. Shipko to support this claim. We have detailed Dr. Shipko's testimony above and need not repeat it at length here. In summary, Dr. Shipko identified the potential adverse side effects of SSRIs such as Paxil, and then opined that at the time appellant killed Milia, he was experiencing a "substance-induced mood disorder of the manic type"-"[H]e had hostility, aggression, and impulsivity that emerged out of a Paxil-induced manic state."

This testimony, we conclude, does not support appellant's assertion that "his conscious mind, having been altered by an unknown and predictable side effect of a medically prescribed substance known to cause precisely these effects, was not in control of his body." Nor do we find, contrary to appellant's claim, any testimony where Dr. Shipko purportedly opined that appellant's "altered mental state affected his ability to form any of the mental states required for the charged crime." While Dr. Shipko testified that appellant was in a Paxil-induced manic state at the time he killed Milia, he never went one step further-a step necessary here-and said that as a result of this manic state, appellant was not acting under his own volition and lacked awareness of what he was doing. Instead, Dr. Shipko acknowledged that appellant, who had a history of abuse, had a lot of reasons in his own mind for wanting to kill Milia. And, he agreed, that a person taking Paxil had the ability to make and carry out a plan to kill.

As to appellant's own testimony, he directs us to his statements that he went "insane," "lost it," and did not remember killing his estranged wife. However, a defendant's inability to remember an event does not constitute substantial evidence supporting an unconsciousness instruction. (*People v. Heffington*, *supra*, 32 Cal.App.3d at p. 10.) As stated long ago in *People v. Samiengo* (1931) 118 Cal.App. 165, 173, "The inability of a defendant ... to remember ... is of such common occurrence and so naturally accountable for upon the normal defects of memory, or, what is more likely, the intentional denial of recollection, as to raise not even a suspicion of the declarations having been made while in an

25

unconscious condition." Likewise, a defendant's statement that he does not remember what happened at the time of the crime is insufficient by itself to justify a finding that he was unconscious. (*People v. Coston* (1947) 82 Cal.App.2d 23, 40-41.)

Appellant argues that "[t]his was not a situation where a defendant simply asserts that his failure of recollection as to the events in question suggests a lack of mental awareness at the time of the crime." Rather, he contends, "he offered an expert's opinion that his conscious mind, having been altered by an unknown and unpredictable side effect of a medically prescribed substance known to cause precisely these effects, was not in control of his body." And in claimed support, appellant analogizes his case to *People v. Moore* (1970) 5 Cal.App.3d 486, 492 (*Moore*).

Appellant is wrong: *Moore* is distinguishable. There, defendant was convicted by a jury of second degree murder. (*Moore, supra*, 5 Cal.App.3d at p. 488.) A psychiatrist testifying on defendant's behalf opined that defendant suffered from paranoid schizophrenia, and at the time of the homicide "was acting on an impulse and was not aware of what he was doing when he shot" the victim. (*Id.* at p. 489.) In the psychiatrist's opinion, "defendant was in a schizophrenic fugue state at the time of the shooting, and what he did 'was an automatic reaction without consideration; he was acting like a person would in a dream without any thought.' " (*Id.* at pp. 489-490.) The Court of Appeal concluded that the trial court committed reversible error by failing to give an instruction on unconsciousness, noting the court's "duty to instruct the jury on all of the issues of law raised by the evidence." (*Id.* at p. 492.)

Here, there was no such expert testimony. Dr. Shipko expressed his belief that at the time appellant killed Milia he experienced a "substance-induced mood disorder of the manic type" manifested by "hostility, aggression, and impulsivity." He never opined that appellant's behavior was "an automatic reaction without consideration," that he was "acting like a person would in a dream without any thought," or anything of that nature.

In light of this, it cannot be said that appellant's unconscious by involuntary intoxication theory was supported by substantial evidence.

Slip Op. at 25-29.

A claim of instructional error does not raise a cognizable federal claim, unless the error "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72(1991); *see also Henderson v. Kibbe*, 431 U.S. 145, 154(1977); *Cupp*

1   *v. Naughten*, 414 U.S. 41, 147 (1973). In determining whether a constitutional violation has

2   occurred, the claimed instructional error must be viewed in light of the instructions as a whole, as

3   well as the trial record. *See Estelle*, 502 U.S. at 72; *Cupp*, 414 U.S. at 147. This is true even

4   when the instructional error involves failure to give an instruction.  *See Henderson*, 431 U.S. at

5   156 ("The significance of the omission of . . . an instruction may be evaluated by comparison

6   with the instructions that were given.").  Because omission of an instruction is less likely to be

7   prejudicial than a misstatement of the law, a habeas petitioner challenging a failure to give an

8   instruction faces an especially heavy burden. *Id.* at 155.

9        The due process right to a fair trial requires that criminal defendants be afforded a

10  meaningful opportunity to present a complete defense. *California v. Trombetta*, 467 U.S. 479,

11  485 (1984).  Thus, a criminal defendant is entitled to adequate instructions on the defense theory

12  of the case. *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000).  This is because "the right to

13  present a defense would be empty if it did not entail the further right to an instruction that

14  allowed the jury to consider the defense." *Bradley v. Duncan*, 315 F.3d 1091, 1098-99 (9th Cir.

15  2002) (citation and internal quotation marks omitted).  Failure to instruct on a defense theory will

16  not constitute error, however, unless "the theory is legally sound and evidence in the case makes

17  it applicable." *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir. 2006) (citations and internal

18  quotation marks omitted).  A defendant is only entitled to jury instructions as to a defense "for

19  which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v.*

20  *United States*, 485 U.S. 58, 63 (1988).

21       Here, the California Court of Appeal reasonably determined that there was not substantial

22  evidence supporting an unconsciousness defense.  In California, unconsciousness is a complete

23  defense to a criminal charge except where caused by voluntary intoxication.  Cal. Penal Code. §

24  26(4); *People v. Heffington*, 32 Cal. App. 3d 1, 8 (1973).  The California Supreme Court's

25  interpretation of this statute, as the Court of Appeal correctly articulated, is that it applies where a

26  defendant is not conscious of his acts: "To constitute a defense, unconsciousness need not rise to

the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.'" *People v. Lemus*, 203 Cal. App. 3d 470, 477 (1988) (citations omitted).  In the present case, no expert testified that Petitioner was unconscious at the time he killed his wife.  Dr. Shipko did testify that among the potential negative side effects of Paxil is disinhibition, the "lack of ability to control one's behavior in response to a thought or fantasy or lack of judgement, lack of impulse control," Rep.'s Tr. at 778, along with hostile and aggressive behaviors.  He also testified that memory loss can occur in Paxil users, and that "when individuals commit particularly violent acts, they generally do not have a recall of doing that." *Id.* at 787.  However, when asked his opinion as to Petitioner, Dr. Shipko concluded that Petitioner was hostile, aggressive, and impulsive as a result of a Paxil-induced manic state, but not that he had ever suffered from disinhibition. *Id.* at 786. On cross-examination, Dr. Shipko agreed with the prosecutor that a person on Paxil could form the necessary intent to kill.

> Q: Now, would you agree with me, Doctor, that a person who's on Paxil, let's say, a 20 milligram dose, one time a day, that was the recommendation , right the prescription?
>
> A: Yes.
>
> Q: Who is on that, they can plan to kill, couldn't they?
>
> A: Absent any other factors, a general person taking Paxil has the ability to make a plan to kill.
>
> Q: And to carry out the plan to kill?
>
> A: All other factors being equal, the Paxil would be irrelevant.
>
> Q: That's it.  It would be irrelevant, right?  Because a person who is on Paxil can decide to kill or not kill just like anybody who is not on Paxil, true?
>
> A: Yes.

Rep.'s Tr. at 809-10.  The only other evidence potentially related to an unconsciousness defense was Petitioner's own testimony that he did not remember killing his wife.

While Dr. Shipko testified that some users of Paxil could enter a legally unconscious state, he never opined that such an occurrence had happened to Petitioner when he killed his wife.  Indeed, Dr. Shipko testified that while the Paxil may have effected Petitioner's decisions, he was still aware of what he was doing: a person taking the prescribed dosage that Petitioner was prescribed was capable of forming the intent to kill.   Furthermore, it is a reasonable conclusion Petitioner's bare allegation that he did not remember killing his wife did not amount to substantial evidence warranting the instruction.  The Court of Appeal reasonably concluded that the evidence adduced a trial did not support Petitioner's requested instruction.  As such, Petitioner is not entitled to relief on this claim.

3.  Claim III

In Claim III, Petitioner alleges that the introduction of statements he made to the police without first being given a warning pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), violated his constitutional rights.[2]  Specifically, Petitioner complains about two separate incidents where he made statements to the police: once just after the incident occurred to police arriving on the scene and once during trial to a court security officer charged with Petitioner's transportation.[3]

At trial, officer Richard Elm testified that he was dispatched to a domestic violence call in Petitioner's neighborhood.  Upon arriving at the scene, Elm made contact with Petitioner and asked him "are you the husband."  Petitioner responded that he was.  Elm then noticed a female on the ground and blood and asked Petitioner "Did you do this?"  Petitioner responded "no."

---

[2]     Respondent asserts that this claim, as well as several of Petitioner's remaining claims, is procedurally barred.  In the interests of judicial economy, and because the claims are easily denied on the merits, the procedural default is not addressed.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (noting that, in the interest of judicial economy, courts might resolve easier matters where complicated procedural default issues exist).

[3]     Petitioner cites to three sections of the reporter's transcript.  After a careful review of the transcript, only two occasions present the potential admission of *Petitioner's* statements to police.

1   Rep.'s Tr. at 130-31.  The introduction of these statements does not violate *Miranda* because

2   Petitioner was not in custody at the time he made them.  *See Rhode Island v. Innis*, 446 U.S. 291,

3   300 (1980); *Mathis v. United States*, 391 U.S. 1, 5 (1968); *California v. Beheler*, 463 U.S. 1121,

4   1125 (1983).  Officer Elm had only just arrived at the scene of the crime and was attempting to

5   find out what had happened.  Petitioner was not yet under arrest.

6       Petitioner's second contention is equally without merit.  After a day of trial, Petitioner

7   was being escorted back to the jail when an officer asked him what his nationality he was.

8   Petitioner responded that he was Palestinian and "Palestinian men kill their wives when they

9   have boyfriends."  The jury never heard about the statement, however, because the trial court

10  held that the officer violated the Sixth Amendment by asking Petitioner a question in the middle

11  of trial without his counsel being present.  Rep.'s Tr. at 531.  As such, the statement was not

12  admitted against Petitioner at trial and he is not entitled to relief on this claim.

13      4. Claim IV

14      Petitioner next claims that the prosecution failed to provide him with exculpatory

15  evidence under *Brady v. Maryland*, 373 U.S. 83 (1963).  Specifically, Petitioner claims that the

16  prosecution was aware of studies that had shown that Paxil could lead people to commit

17  homicide and failed to disclose a toxicology report of blood drawn from Petitioner shortly after

18  the homicide.  In denying this claim on Petitioner's state petition for habeas corpus, the

19  California Superior Court stated as follows:

20          With regard to Petitioner's argument that a *Brady* violation
            occurred, first, there is no evidence that a report that shows that
21          Paxil causes people to commit murder exists.  Second, even
            assuming *arguendo* that such a report exists, there is no evidence
22          that it was in the District Attorney's possession or in the possession
            of any agency that is part of the prosecutorial team.  As such,
23          Petitioner fails to state a prima facie case that a *Brady* violation
            occurred.  (*Brady v. Maryland* (1963) 373 U.S. 83; *In re Brown*
24          (1998) 17 Cal.4th 873, 879; Pen. Code, § 1054.)

25          Petitioner fails to show that the District Attorney violated *Brady* by
            witholding evidence that Paxil was in Petitioner's bloodstream.
26          The record shows that the District Attorney considered calling a

30

toxicologist to testify that Petitioner had a residual amount of Paxil in his bloodstream, but that trial counsel objected. (Transcript, 764.) The record likewise shows that trial counsel had the District Attorney's toxicologist's report and knew which toxicologist the District Attorney was considering calling as a witness. (*Id.*) As such, there is no evidence that the prosecutor failed to disclose any evidence; on the contrary, the record shows that trial counsel was fully aware of the evidence that the District Attorney had.

Ex. K at 2.

In order to prevail on a claim pursuant to *Brady*, a defendant must demonstrate that: (1) the evidence at issue is favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was suppressed by the State, either willfully or inadvertently; and, (3) prejudice resulted. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Accordingly, the prosecution has "a duty to learn of any favorable evidence known to the others acting on the government's behalf, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). However, even if the prosecution fails to disclose evidence, that evidence must be material, *i.e.*, there must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

As to the evidence that Paxil can cause people to commit homicides, Petitioner fails to show the prosecution was or should have been aware of such a study, assuming that such study even exists. Petitioner alleges that the United States Food and Drug Administration listed homicide as a potential side effect of Paxil and that courts in various states had recognized the homicidal effects of the drug. Even assuming this is true, Petitioner cannot establish that this information was suppressed by the prosecution as it would be readily available to the public. Additionally, an expert, as discussed above, testified on Petitioner's behalf about the potential side effects of Paxil. That expert had prescribed Paxil to hundreds of patients and written two studies on the drug. For these reasons, Petitioner fails to show that the prosecution suppressed any evidence that was favorable to Petitioner.

Petitioner fairs no better on his claim that the prosecution withheld the results of a blood

31

1  test of blood taken from Petitioner shortly after the homicide, which showed he had Paxil in his

2  system.  First, as the Superior Court noted, the record shows that Petitioner's trial counsel was

3  aware of the toxicology report, though the report was given to her somewhat late in the

4  proceedings and she had not had a chance to consult with the toxicologist who examined the

5  blood.  Rep.'s Tr. at 764.  Second, Petitioner fails to establish that the toxicology report was

6  material to his defense.  A review of the trial record shows that there was no dispute that

7  Petitioner was on Paxil at the time he killed his wife.  The issue at trial was what effect the Paxil

8  had on Petitioner's state of mind.  Furthermore, in determining not to give the jury an

9  unconsciousness instruction (as discussed in Claim II, *supra*), the trial court relied on the fact that

10  Petitioner had not provided any evidence that Paxil had put him in an unconscious state, not that

11  Petitioner was not under the influence of Paxil.  Petitioner fails to show that he is entitled to

12  relief on this claim.

13     5.  Claim V

14     In Claim V, Petitioner asserts that his trial counsel did not provide the effective assistance

15  of counsel required by the Sixth Amendment.  Petitioner asserts a litany of ways, approximately

16  forty-three in total,[4] that he believes his trial counsel was ineffective, though his claims focus on

17  three distinct areas of his defense: the lack of investigation of his wife's boyfriend; the failure to

18  produce additional evidence regarding the effects of Paxil to prove Petitioner was legally

19  unconscious when he killed his wife, including evidence such as the toxicology report showing

20  that he was on Paxil at the time of the homicide; and, failing to investigate and present evidence

21  relating to Petitioner's culture while prejudicing the jury pool by asking the venire about

22  September 11, 2001.  The Superior Court concluded that Petitioner failed to state a prima facie

---

[4]   There is only a modicum of clarity in the Petition regarding Petitioner's ineffective assistance of counsel claims.  It lists three distinctive ineffective assistance of counsel claims, but lists forty-three ways that counsel was deficient in a section that is entitled "supporting facts."  Because Petitioner is *pro se*, each of his claims that has been fairly presented, be it in the initial argument or the supporting facts, has been reviewed.

1  case for relief on any ground.

2        The Sixth Amendment guarantees effective assistance of counsel.  In *Strickland v.*

3  *Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating

4  ineffective assistance of counsel.  First, the petitioner must show that considering all the

5  circumstances, counsel's performance fell below an objective standard of reasonableness.  *See id.*

6  at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result

7  of reasonable professional judgment.  *See id.* at 690.  The federal court must then determine

8  whether in light of all the circumstances, the identified acts or omissions were outside the range

9  of professional competent assistance.  *See id.*  "[C]ounsel is strongly presumed to have rendered

10  adequate assistance and made all significant decisions in the exercise of reasonable professional

11  judgment."  *Id.*

12        Second, a petitioner must affirmatively prove prejudice.  *See id.* at 693.  Prejudice is

13  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

14  result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a

15  probability sufficient to undermine the confidence in the outcome."  *Id.*  The likelihood of a

16  different result must be substantial, not just conceivable."  *Harrington v. Richter*, __ U.S. __, 131

17  S.Ct 770, 791, 178 L.Ed.2d 624 (2011).  A reviewing court "need not determine whether

18  counsel's performance was deficient before examining the prejudice suffered by defendant as a

19  result of the alleged deficiencies . . . [i]f it is easier to dispose of an ineffectiveness claim on the

20  ground of lack of sufficient prejudice . . . that course should be followed."  *Pizzuto v. Arave*, 280

21  F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 697).  When analyzing a claim for

22  ineffective assistance of counsel where a state court has issued a decision on the merits, a habeas

23  court's ability to grant the writ is limited by two "highly deferential" standards.  *Premo v. Moore*,

24  __ U.S. __, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011).  "When § 2254(d) applies," as it does

25  here, "the question is not whether counsel's actions were reasonable.  The question is whether

26  there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*;

1    *see also Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) ("Under § 2254(d)'s 'unreasonable

2    application' clause, a federal habeas court may not issue the writ simply because that court

3    concludes in its independent judgment that the state-court decision applied *Strickland* incorrectly.

4    Rather, it is the habeas applicant's burden to show that the state court applied *Strickland* to the

5    facts of his case in an objectively unreasonable manner." (citations omitted)).

6          A number of Petitioner's ineffective assistance of counsel claims fail to state a claim for

7    ineffective assistance of counsel and thus fail to state a prima facie case for relief.  These

8    Findings and Recommendations will address those claims which could, at least potentially,

9    entitle Petitioner to relief.  All claims that are not directly addressed fail to state a claim.

10         First, Petitioner claims that his attorney should have done further investigation with

11   regard to his wife's boyfriend, Al-Harbi.  This claim fails because Petitioner does not, and

12   cannot, show how further investigation on this point would have potentially altered the trial.  At

13   trial, the only point of contention was Petitioner's mental state at the time he killed his wife.

14   Petitioner's beliefs regarding Al-Harbi may have been relevant to this point, and Petitioner was

15   allowed to testify to such effect.  Al-Harbi's actual background was entirely irrelevant to the

16   court proceedings, and any investigation was unnecessary.

17         Petitioner next contends that his attorney should have done additional research regarding

18   the negative side effects of Paxil.  Petitioner contends that his only potential defense to the crime

19   was unconsciousness due to the medication, and his attorney's failure to properly investigate

20   those side effects amounted to ineffective assistance.  A careful review of the record shows that

21   Petitioner's counsel did, in fact, investigate the potential side effects of Paxil.  Indeed, defense

22   counsel called an expert to testify on Petitioner's behalf regarding the potential side effects of

23   Paxil, including disinhibition, which could potentially support a unconsciousness defense.  That

24   expert, however, did not conclude that Petitioner suffered from disinhibition as a result of his

25   Paxil use.  Any additional research regarding the side effects of Paxil was irrelevant and

26   duplicative.  It was not disputed that Paxil could potentially cause someone to act unconsciously,

1    but rather that Petitioner was suffering from such a negative side effect.

2           Petitioner also contends that when his attorney called several doctors to testify about

3    Petitioner's delusions she undermined his unconsciousness defense.  To the contrary, this

4    testimony attempted to bolster the defense's argument that Petitioner did not possess the mental

5    state necessary to be convicted of first degree murder by showing that he was suffering from

6    delusions about his wife and her new boyfriend, whom he believed was an Al Qaeda spy.  The

7    testimony also helped to explain why Petitioner had been prescribed Paxil, an anti-depressant.

8    While some of the testimony from the doctors may have damaged Petitioner's unconsciousness

9    defense, as discussed above, Petitioner failed to establish such a defense because there was no

10   testimony that he actually suffered from disinhibition.  As such, this did not prejudice

11   Petitioner's case.

12          Petitioner next finds error with his counsel's failure to present into evidence the

13   toxicology report showing that he had Paxil in his bloodstream at the time of the homicide.  As

14   discussed above in Claim IV, the prosecution did not dispute or rebut Petitioner's testimony that

15   he was under the influence of Paxil at the time of the crime.  The only issue at trial was the effect

16   of the Paxil *on* Petitioner.  The failure to present to toxicology report did not prejudice Petitioner.

17          Petitioner also claims that his counsel should have called several witnesses, including: his

18   previous defense and divorce attorneys; his neighbor Danny; the nurse who drew his blood at the

19   hospital; the nurse for the doctor that prescribed Paxil (the doctor was deceased at the time of

20   trial); an expert on Arab culture; and, Petitioner's brother and girlfriend.  Petitioner fails to show

21   how testimony from any of these people would have altered the outcome of the trial.

22          In addition to failing to call an expert on Arab culture, Petitioner claims that his counsel

23   infected the jury with prejudice when she asked the potential jurors about their feelings regarding

24   the September 11, 2001 terrorist attack on the United States.  Petitioner fails to make more than a

25   bare allegation about how the questioning prejudiced his case.  Indeed, considering the case

26   involved several people of Middle-Eastern decent, it was a practical and rational choice to

35

attempt to remove jurors who may have had a bias towards people from that region, regardless of their religious affiliation.

The remainder of Petitioner's claims fail to state a claim which could potentially entitle him to relief.  Petitioner has failed to establish that his trial counsel provided ineffective assistance.

### 6.  Claim VI

In claim VI, Petitioner alleges that his appellate counsel was ineffective for failing to raise claims III, IV, and V on direct appeal.  The same ineffective assistance of counsel standards discussed in the previous claim apply to this claim as well.  Petitioner fails to show that he was prejudiced by his appellate attorney's failure to present the claims on direct appeal.  Those claims have been addressed in state court in a state petition for habeas corpus and now in federal court in this petition.  No court has found Petitioner's claims to be meritorious.  As such, Petitioner cannot establish that he was prejudiced by his counsel's failure to raise these claims on appeal and he is not entitled to relief on this claim.

### 7.  Claim VII

Finally, Petitioner claims that the cumulative effect of the constitutional violations at his trial rendered his trial fundamentally unfair in violation of his right to due process.  As discussed above, only one of Petitioner's claims presented any error of potentially constitutional dimension.  That error was determined to be harmless.  There was no cumulative error at Petitioner's trial and, therefore, this claim must fail.

## V.  REQUEST FOR AN EVIDENTIARY HEARING

Finally, Petitioner requests an evidentiary hearing on his claims.  A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate." *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate

36

1    that he has presented a "colorable claim for relief." *Earp*, 431 F.3d at 1167 (citations omitted).

2    To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if

3    true, would entitle him to relief." *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (internal

4    quotation marks and citation omitted).  In this case, Petitioner's claims are readily determined by

5    the record.  Petitioner has not alleged any additional facts that, if true, would entitle him to relief

6    and, therefore, Petitioner fails to demonstrate that he has a colorable claim for federal habeas

7    relief.  Moreover, the Supreme Court has recently held that federal habeas review under 28

8    U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the

9    claim on the merits" and "that evidence introduced in federal court has no bearing on" such

10   review.  *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398, 1400 (2011).  Thus, his request

11   will be denied.

## VI.  CONCLUSION

13   Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an evidentiary

14   hearing is DENIED.

15   For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for

16   writ of habeas corpus be DENIED.

17   These findings and recommendations are submitted to the United States District Judge

18   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

19   after being served with these findings and recommendations, any party may file written objections

20   with the court and serve a copy on all parties.  Such a document should be captioned "Objections

21   to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be

22   served and filed within seven days after service of the objections.  The parties are advised that

23   failure to file objections within the specified time may waive the right to appeal the District

24   Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file,

25   Petitioner may address whether a certificate of appealability should issue in the event he elects to

26   file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254

1   Cases (the district court must issue or deny a certificate of appealability when it enters a final

2   order adverse to the applicant).

3   DATED:  March 15, 2012

4

5

6

7

8
                                    _____
9                                   TIMOTHY J BOMMER
                                    UNITED STATES MAGISTRATE JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26